IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MED-EL ELEKTROMEDIZINISCHE GERÄTE GES.M.B.H. and MED-EL CORPORATION, USA,<br><br>*Plaintiffs,*<br>v.<br><br>ADVANCED BIONICS, LLC, et. al,<br><br>*Defendants.* | Case No. 1:18-cv-01530-JDW |

### AMENDED MEMORANDUM

Pursuant to this Court's Order dated November 4, 2019 (D.I. 55), Plaintiffs MED-EL Elektromedizinische Geräte Ges.m.b.H. and MED-EL Corporation, USA (collectively, "MedEl") and Defendants Advanced Bionics, LLC, Advanced Bionics AG, and Sonova AG (together, "AB") have submitted to the Court for construction ten claim terms from the following US Patent Nos.: (a) 7,076,308; (b) 8,270,647; (c) 7,267,847; (d) 8,634,909; and (e) RE46,057. The patents relate to a range of technologies used in cochlear implants. The Court held a *Markman* hearing on June 5, 2020. In addition, the parties have submitted to the Court several agreed-upon constructions, which the Court will adopt.

### I.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWS Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quote omitted). Claim construction is a matter of law. *See Teva Pharm. USA v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015). There is no "magic formula or catechism" for construing a patent claim, nor is a court barred from considering "any particular sources or required to analyze sources in any specific sequence." *Phillips*, 415 F.3d at 1323. Instead, a court is free to attach the

appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

A court generally gives the words of a claim their ordinary and customary meaning, which is the "meaning that the term would have to a person of ordinary skill in the art at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (quote omitted). Usually, a court first considers the claim language; then the remaining intrinsic evidence; and finally, the extrinsic evidence in limited circumstances. *See, e.g., Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," a court also must consider the context of the surrounding words. *Id.* at 1314. In addition, the patent specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). But, while a court must construe claims to be consistent with the specification, the court must "avoid the danger of reading limitations from the specification into the claim," *Phillips,* 415 F.3d at 1323. This is a "fine" distinction. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186–87 (Fed.Cir.1998). In addition, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction. *Hill-Rom Svcs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quote omitted).

A court may refer to extrinsic evidence only if the disputed term's ordinary and accustomed meaning cannot be discerned from the intrinsic evidence. *Vitronics,* 90 F.3d at 1584. Although a court may not use extrinsic evidence to vary or contradict the claim language, extrinsic materials

"may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history," *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Extrinsic evidence is used "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art." *Phillips*, 415 F.3d at 1318. The Federal Circuit has cautioned against relying upon expert reports and testimony that is generated for the purpose of litigation because of the likelihood of bias. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.")

Ultimately, the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Renishaw PLC v. Marposs Societa' per Anzioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that a "claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quote omitted.)

## II. ANALYSIS

### A. '308 Patent Terms

The '308 Patent is directed to using "fitting" software for cochlear implant devices to "properly map sensed sound to stimulation current levels that can be perceived by the patient as sound." (D.I. 61-1, Ex. A at 2:51-54.) The patent states that prior fitting systems required first systematically measuring higher ("M-Levels") and lower ("T-levels") threshold values of stimulation currents that cause the user to perceive sound. The invention is directed to eliminating the measurement of channel-by channel T-Levels of the implant's electrodes. (*Id.* at 3:48-58.)

### 1. "T-Level comprises a minimally perceptible stimulation intensity" (Claims 1-3)

| |
|---|
| **MedEl** <br> The minimum stimulation current which when applied to a given electrode associated with the channel produces a sensed perception of sound at least 50% of the time |
| **AB** <br> No construction necessary, or, T-Level comprises a level of stimulation intensity that is near the lower end of what a patient is able to perceive as sound |
| **Court** <br> T-Level comprises the lowest stimulation intensity that the patient can observe. |

As an initial matter, the Court concludes that this claim term requires construction. Although the claim defines a "T-Level," the definition uses the term "minimally perceptible stimulation intensity," and the parties disagree about the meaning of that term. The Court therefore rejects AB's position that no construction is needed. Each party's proposed construction also suffers flaws.

AB's proposed construction ignores the claim language itself. By proposing a construction that defines the T-Level as "near" the lower end of what a patient can perceive, AB allows for the possibility that the T-Level includes a stimulus intensity that the patient can never perceive. That construction is at odds with the concept of an intensity level that is "minimally perceptible." *See Iceutica Pty. Ltd. v. Lupin Ltd.*, Civ. No. 14-1515-SLR, 2016 WL 790947, at * 2 (D. Del. Feb. 29, 2016) ("perceptible" means "observable").

MedEl, on the other hand, proposes to read into the claim a numerical limitation of 50%. MedEl takes that limitation from the specification, which says that a T-Level "represents the minimum stimulation current which when applied to a given electrode associated with the channel produces a sensed perception of sound at least 50% of the time." (D.I. 61-1, Ex. A at 2:40-46.) An inventor can use the specification to disclaim or disavow the broad scope of a claim, but the intention must be clear. *See Conoco, Inc. v. Energy & Environmental Intern., L.C.*, 460 F.3d 1349,

4

1357 (Fed. Cir. 2006). That intention is not clear here. The patent uses a numerical-based definition of "T-Level" in the specification. But in the claim, it uses a qualitative measure. That disparity suggests that the 50% perception level in the specification is a preferred embodiment, not a disavowal.

MedEl argues that if the Court does not adopt a 50% level, then the claim becomes indefinite because there is no objective measure of "minimally perceptive." The Court disagrees. Not every claim needs to be reduced to a numerical certainty in order to avoid an indefiniteness problem. Here, the claim term uses qualitative terms, but that does not render it indefinite.

To reconcile the competing concerns, the Court adopts the construction described above. That construction gives effect to the claim term "minimally perceptible," which requires a T-Level that is above, not below, the level the patient can observe. It also avoids importing a numerical limit inappropriately.

### 2. "the multiple electrode contacts;" "all of the electrode contacts;" "the electrode contacts" (Claims 1-3)

| | |
|---|---|
| **MedEl** Each and every one of the electrode contacts in the electrode array | |
| **AB** All of the electrode contacts to be fitted | |
| **Court** Each and every one of the electrode contacts in the electrode array | |

Each of these phrases refers to language in the preamble of the claims: "multiple electrode contact through which electrical stimulation may be applied." (D.I. 61-1, Ex. A at 14:24-27.) Then, some of the claim language refers to subsets of those multiple electrode contacts, while other claim language refers to all of the electrode contacts. For example, the first claim limit in each claim refers to "selected ones of the multiple electrode contacts." (*Id.* at 14:28-31, 14:44-47, 14:60-64.) The second claim limit refers to "all of the electrode contacts," for which a T-Level is determined

"globally." (*Id.* at 14:33-35, 14:48-50, 14:65-67.) This language makes clear that the "electrode contacts" is a broad universe from which a subset can be selected. It refers to all of the electrode contacts on the array.

AB argues that the language refers only to the electrodes being fitted for a particular patient. AB's construction would ignore the possibility of electrodes that could be, but are not, used to provide stimulation. AB argues that the claims and the specification contemplate embodiments in which some electrodes are not used to provide any stimulation. But that does not save its position, for two reasons. First, the claim language allows for a selection of a subset of electrodes. So AB's concern about excluding a preferred embodiment is a false concern. Second, AB's construction makes little sense in the context of the first claim limit. If the Court were to adopt AB's construction, then that claim limit would mean, "measuring M-levels associated with a stimulus applied to selected ones of all of the electrode contacts to be fitted." That makes no sense. A patient needs the M-level set on all of the active electrodes that are being fitted, not just to selected ones. MedEl's construction, on the other hand, does not allow for such a nonsensical reading. The Court therefore adopts it.

### 3. "using the M- and T-levels to help set the intensity of stimuli applied to the electrode contacts after fitting" (Claims 1-3)

| | |
|---|---|
| **MedEl** | Using the M- and the globally determined T-levels to properly map sensed sound to stimulation current levels that can be perceived by the patient as sound after fitting |
| **AB** | No construction necessary, or, using the M- and T-levels to help set the intensity of stimuli that will be delivered through the electrode contacts after fitting |
| **Court** | Using the M- and T- levels as at least one of the factors to set the intensity of stimuli applied to the electrode contacts after fitting |

The Court concludes that this term requires construction. The term "help set" lacks enough clarity to import meaning to the claim as a whole. *See Perfectvision Mfg., Inc. v. PPC Broadband, Inc.*, No. 4:12CV00623 JLH, 2014 WL 4285786, at *22 (E.D. Ark. Aug. 29, 2014). As the Court pointed out during the claim construction hearing, using the M- and T-levels as log-in information for fitting software would "help" to set the levels. But the specification does not leave open that possibility because it explains that the fitting software should employ the M-level and the T-level in the fitting. (D.I. 61-1, Ex. A at 2:51-54.) Thus, the Court rejects AB's position that no construction is necessary.

Both parties propose problematic constructions, however. AB's construction continues to use the words "to help," without any clarity about what constitutes "help" in these circumstances. MedEl, on the other hand, introduces several new limits that do not appear in the claim language. For example, it is not clear what it means to "properly map" sound. MedEl also suggests that the M- and T-levels are the only things used to set the stimulation levels for the electrode array. But the patent is not so limiting. Therefore, any construction must allow for other factors.

The Court construes the term to mean "using the M- and T- levels as at least one of the factors to set the intensity of stimuli applied to the electrode contacts after fitting." This language requires the M- and T- levels to be factors in the fitting, but it allows for the possibility of other factors, as well.

### B.     '647 Patent Terms

The '647 Patent discloses a cochlear implant system whose external portion consists of a core and modular components. But it does not define either term. The parties disagree about the meaning of both "core" and "modular component."

7

1.      "core" (Claims 8, 11, 16, 18, 21-23)

| | |
|---|---|
| **MedEl** Ordinary meaning, namely, the central, innermost part | |
| **AB** No construction necessary, or, component containing the external sound processing electronics | |
| **Court** Base containing the specified electrical components | |

Both parties claim that the term "core" does not need a construction, but they disagree about its meaning. Given that the term "core" can have different meanings, any of which could apply here, the Court concludes that the term requires construction. However, the Court will not adopt either party's proposed construction because both parties propose constructions that are at odds with the '647 Patent.

First, contrary to MedEl's position, the term "core" does not refer to physical location. Figures 8A and 8B disclose embodiments in which the core is not at the center or innermost part. In addition, unasserted claims in the '647 Patent use language specifying the location of the core. For example, independent claim 14 describes the modular ring as "entirely circumscribe[ing]" the core. (*E.g.*, D.I. 61-1, Ex. B. at 12:9-14.) That language shows that the inventors knew how to specify physical location. *See Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). It also would be redundant if the core were already the innermost part.

Second, AB's proposed requirement that the core contain the "external sound processing electronics" fails for much the same reason. Many claims in the patent specify the components that a core must contain. Claim 1 requires that it contain "a sound processor for processing sound and providing a corresponding signal to said implanted antenna." (D.I. 61-1, Ex. B. at 11:4-8.) Claim 16 requires the core to include a "microphone, sound processor circuitry that produces a signal representing ambient sound to be transmitted to a cochlear implant, and a transmitter that transmits

8

said signal to the cochlear implant . . ..." (*Id.* at 12:24-28.) Claim 24 requires the core to include "a microphone and sound processor . . . and a first plurality of electrical contacts." (*Id.* at 13:13-16.) AB's proposed construction, which requires the core to include all external sound processing electronics, does not account for these variations.

The Court construes the term "core" to mean a "base containing the specified electrical components." The word "base" indicates that it is the foundational portion of the external part of the system. In addition, the reference to the "specified electrical components" allows for the different parts of the core that each claim specifies.

### 2. "[a/the] modular component" (Claims 8, 9, 16, 21-23)

| |
|---|
| **MedEl** <br> Plain and ordinary meaning/no construction required |
| **AB** <br> [A/the] separately enclosed component |
| **Court (per agreement of parties)** <br> Detachable self-contained unit |

The Parties initially disputed whether the term "modular component" required construction. During the hearing, however, the Parties agreed that "detachable self-contained unit" was an acceptable construction. (Tr. of Hearing dated June 5, 2020, 59:17-21.) The Court adopts that construction.

### C. '847 Patent Terms

The '847 Patent describes a process for sealing small crevices, chinks, and/or openings in walls of housings against fluid penetration while maintaining some gas permeability. Although the patent language itself is not specific to cochlear implants, the prosecution history demonstrates that the examiner allowed the claims only by limiting them to hearing devices.

9

### 1. "hydrophobic" (Claims 1 and 2)

| | |
|---|---|
| **MedEl** | Lacking affinity for water wherein the contact angle between the water droplet with the surface exceeds 90 degrees |
| **AB** | Having resistance to water penetration, or, having resistance to water penetration wherein the contact angle between a water droplet and the material surface exceeds 80 degrees |
| **Court** | Having resistance to water penetration wherein the contact angle between a water droplet and the material surface exceeds 90 degrees |

The Court's construction of this term rests on two conclusions: (1) the inventors defined "hydrophobic" in terms of the contact angle between the surface and a water droplet; and (2) the relevant contact angle is 90 degrees.

First, the parties dispute whether to impose a numerical limitation into the claims. Although the specification does not provide a precise definition of "hydrophobic," it describes components that are, and are not, hydrophobic in terms of their contact angle. (*E.g.*, D.I. 61-1, Ex. D at 3:5-7, 3:12-15.) The Court therefore concludes that the inventors intended, and a person skilled in the art would have understood, the contact angle to define whether something is "hydrophobic." This use of contact angles in the specification undermines AB's argument that the patent describes the term "hydrophobic" only in general terms. AB also points to dictionary definitions of "hydrophobic" to bolster its case. But dictionary definitions shed little light on how a person skilled in the art would have understood the term at the time. *See Phillips*, at 415 F.3d at 1320. The Court affords little weight to that extrinsic evidence.

Although the specification uses illustrative contact angles, there is no reason to import those contact angles into the claim. In describing an untreated surface, the specification describes a contact angle that is "substantially below" 80 degrees. (D.I. 61-1, Ex. D at 3:6-7.) It then illustrates a hydrophobic coating that has a contact angle that is "above 100" degrees. (*Id.* at 3:12-

10

15.) While these illustrations demonstrate that a contact angle above 100 degrees is hydrophobic, they do not establish the lower limit for hydrophobicity. In particular, the patent does not establish 80 degrees as a floor, as AB suggests. The reference to 80 degrees only establishes that a surface with a contact angle substantially below 80 degrees is not hydrophobic. That description does not establish the inverse: that above 80 degrees is hydrophobic. AB also points to references in other patents and patent applications that discuss 80 degrees. But while each of the references to which AB points refers to a contact angle greater than 80 degrees in the context of hydrophobic properties, neither attempts to define the term "hydrophobic." AB's reference to papers that IEEE International published that describe 80 degrees as an acceptable indicator of hydrophobic behavior does provide more useful guidance and weighs in favor of its argument.

However, MedEl's extrinsic evidence is more persuasive. MedEl points to the American Society of Testing Materials' definition of "hydrophobic." This is the only technical extrinsic evidence before the Court that seeks to define the term "hydrophobic." Its technical nature stands it in contrast to the common dictionaries on which AB relies and entitles it to more weight. *See Phillips*, 415 F.3d at 1318. In addition, it comes from the ASTM, which "is one of the largest voluntary standards developing organizations in the world. [It is] a not-for-profit organization that provides a forum for the development and publication of international voluntary consensus standards for materials, products, systems and services." *Beacon Adhesives, Inc. v. United States*, 134 Fed. Cl. 26, 43 (2017) (quoting the ASTM International website). Courts have looked to ASTM standards as an authoritative source. *See, e.g.*, *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1332 (Fed. Cir. 2006). A person skilled in the art would be familiar with and rely on ASTM standards. ASTM International defines "hydrophobicity" as "the property that defines a material as being water repellent. Water exhibits an obtuse contact angle with hydrophobic

11

materials." An obtuse angle has a measurement of greater than 90 degrees but less than 180 degrees. Therefore, the Court will construe "hydrophobic" as having a contact angle greater than 90 degrees.

### 2. "wherein a certain gas permeability has to be obtained;" "at which a certain gas exchange with the environment has to be guaranteed" (Claims 1 and 2, respectively)

| | |
|---|---|
| **MedEl** | Wherein a gas permeability has to be obtained with respect to said sealing sufficient to provide a sufficient supply of oxygen to maintain the operation voltage of a zing-air-battery in a hearing device<br><br>At which a certain gas exchange with the environment has to be guaranteed with respect to said sealing sufficient to provide a sufficient supply of oxygen to maintain the operation voltage of a zinc-air-battery in a hearing device |
| **AB** | No construction necessary, or<br><br>Wherein some level of gas permeability has to be obtained to permit operation of the hearing device<br><br>At which some level of gas exchange with the environment has to be guaranteed to permit operation of the hearing device |
| **Court** | Wherein a level of gas permeability greater than zero as needed to ensure the operability of the device has to be obtained |

The Court determines that these terms require construction to clarify that the "certain gas permeability" and "certain gas exchange" must be more than zero, as the specification requires. (D.I. 61-1, Ex. D at 1:61-64, 1:67-2:1.) However, MedEl wants to go one step further and limit these claims to the level of permeability and exchange needed for a zinc-oxide battery. The Court will not impose such a limit.

The claim language itself does not reference a zinc-oxide battery. The specification does, but only as a preferred embodiment. (*Id.* at 1:61-64 ("As most of these medical devices, such as e.g. hearing aid devices, are operated with sinc-air-batteries . . . .").) The specification also refers

12

to "other electronic or electrical components which need certain aeration." (*Id.* at 1:65-66.) There must be "textual reference in the actual language of the claim with which to associate [the] proffered claim construction." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1331 (Fed. Cir. 2007). Yet there is nothing in the patent language that would indicate that its application is limited only to hearing devices with zinc oxide batteries. Nor does the patent contain the type of "clear disclaimer of particular subject matter" to suggest that the inventor gave up devices using batteries other than zinc-oxide batteries. *See Northrup Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003).

The Court concludes that the references to a "certain" gas permeability or "certain" gas exchange refers to the device's needs. So, if a device employs a battery that requires a higher level of gas permeability, the claim allows for that possibility.

### D.     '909 Patent Terms

#### 1.     "a planar disc shaped first attachment magnet within the coil housing, the first attachment magnet adapted to be rotatable therein" (Claims 1, 10)

| **MedEl** |
|---|
| Plain and ordinary meaning/no construction necessary |
| **AB** |
| A coin-shaped first attachment magnet designed to rotate about a single rotational axis within the coil housing |
| **Court** |
| No construction necessary |

The parties limited their dispute about this term to the language about what is "rotatable." AB argues that because the claim contemplates a disc rotating but maintaining a dipole moment that is substantially parallel to the planar outer surface, then logic must dictate that the disc can only rotate along a single axis. Other claim language might limit the scope of rotation that the claim language at issue permits. But that claim language will apply regardless of whether the Court

13

adopts AB's construction or not. At the same time, nothing in the claim language or specification indicates that the inventors intended to limit the term "rotatable," even if all of the claim limits together impose that limit. Indeed, it appears to the Court that the patent might allow the disc to wobble on axes other than the one that AB proposes. (Tr. at 85.) Because AB has not demonstrated that the claim term has more than one ordinary meaning, the Court concludes that this claim term does not require any construction. *See O2 Micro Intern., Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

### 2. "configured within the coil housing such that the magnetic dipole moment remains substantially parallel to the planar outer surface of the coil housing" (Claims 1, 10)

| | |
|---|---|
| **MedEl** | Plain and ordinary meaning/no construction required |
| **AB** | Configured such that the dipole moment is not allowed to become perpendicular to the skin of the patient and it remains substantially parallel to the plane of the coil housing |
| **Court** | No construction necessary |

As with the prior term, AB asks the Court to construe this term but does not demonstrate the existence of multiple possible meanings. In particular, AB wants the Court to impose a limit that precludes the dipole moment from being perpendicular to the skin. But it already includes a limitation that the dipole moment remains substantially parallel to the outer surface of the coil housing. The requirement that the magnet remain parallel to the housing, which is placed under the skin, eliminates the possibility that the magnetic dipole can be perpendicular to the skin. In the absence of an alternative possible construction, the Court can rely on the plain and ordinary meaning.

In claim construction briefing, AB argued that adopting the plain meaning would be reversible error under *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314 (Fed. Cir.

14

2016). In that case, the Federal Circuit held that a district court must resolve a dispute about claim scope if the parties raise one. Here, the parties' dispute is simple: MedEl says that the terms do not require construction; AB says they do. The fact that one party says that terms require construction does not make it so. In fact, AB's argument is at odds with its own position on earlier terms, when it said that no construction was needed. The fact that AB hedged its bets and also proposed constructions for those terms does not change the fact that, when convenient, AB thinks it appropriate to ask the Court not to construe a term. Here, the Court is resolving the parties' dispute. It is doing so by concluding that AB has not demonstrated that the claim term is susceptible to more than one meaning and therefore has not persuaded the Court that the claim terms need construction.

### E.     '057 Patent Term—"maintain the external portion in a fixed position on the skin relative to the implantable portion" (Claim 19)

| **MedEl** |
|---|
| Plain and ordinary meaning/no construction required |
| **AB** |
| Maintain the orientation and position of the external portion on the skin relative to the implantable portion |
| **Court** |
| Maintain the external portion in a fixed position on the skin and in a fixed alignment with the internal component |

The parties' dispute about this term centers on the word "fixed." The Court concludes that the term requires construction. As AB points out in the claim construction brief, "fixed" could apply only to the position on the skin, or it could apply both to the position on the skin and the orientation relative to the internal portion of the implant. These competing potential meanings require construction. The Court therefore rejects MedEl's position.

The Court concludes that the term "fixed position" refers both to the position on the skin and its alignment with the internal component. Notably, claim one of the '057 patent (which was

15

not allowed) provided for a magnet that would "maintain[] a position of the external portion relative to the implantable portion . . ." (D.I. 61-1, Ex. F at 13:18-23.) In contrast, claim 19, which is at issue, provides for a magnet to "maintain the external portion in a fixed position on the skin relative to the implantable portion." (*Id.* at 14:42-47.) The use of the phrase "fixed position" in claim 19 must mean something beyond what claim 1 would have provided. That difference is the alignment between the external and internal components. Indeed, at the claim construction hearing, MedEl agreed with that principle. (Tr. at 118-20.)

Although AB urges the Court to introduce the word "orientation" into the construction, the Court declines to do so. The term "orientation" does not clarify the claim term's meaning; it muddies it. It confused the Court in briefing and at the hearing. The confusion is greater in this case because the jury will hear about orientation about magnetic dipoles, and hearing about a different kind of orientation with respect to this claim would add confusion. The Court's construction of this term captures the meaning of "fixed position" while avoiding that lack of clarity.

## III.   CONCLUSION

The Court will construe the disputed claims as described above, and it will adopt the parties' agreed-upon constructions. An appropriate Order follows.

                                            **BY THE COURT:**

                                            */s/ Joshua D. Wolson*
                                            **JOSHUA D. WOLSON, J**.
                                            **United States District Judge**

October 9, 2020