**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **MED-EL ELEKTROMEDIZINISCHE GERATE GES.M.B.H.,** | |
| *Plaintiff,* | **Case No. 1:18-cv-01530-JDW** |
| v. | |
| **ADVANCED BIONICS, LLC, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

This patent suit between MED-EL Elektromedizinische Gerate GES.M.BH. and MED-EL Corporation, USA (collectively, "MED-EL"), and Advanced Bionics, LLC, Advanced Bionics AG, and Sonova AG (collectively "AB"), concerns patents for cochlear implants. Each side has asserted infringement claims, and each has moved for summary judgment.

## I.      BACKGROUND

### A.      Facts

Cochlear implants generate sound sensations in deaf or partially deaf patients by direct electrical stimulation of the auditory nerve. These devices encompass two main components: a surgical implant under the patient's skin near the cochlea and a removable external headpiece. A magnet in the implant holds the external headpiece in place. Some people wear cochlear implants with hearing aids to enhance their effectiveness.

Some of the patents at issue relate to the magnets in the implant. In earlier versions of the devices, the implant magnet caused problems for patients who needed an MRI. Because an MRI uses a powerful magnet, patients needed to remove the implant. Inventions incorporating rotating magnets in the implant solved the problem and permit patients to avoid surgery and wear the implant without injury during an MRI.

The remainder of the asserted patents concern software for "fitting" cochlear implants. Generally, a clinician fits the devices by modifying various parameters to ensure comfortable sound ranges. This can be a cumbersome process that requires the clinician and the patient to test multiple threshold ranges to determine what is audible, barely audible, or not audible. In the past, it wasn't possible to fit acoustic and electric parameters at the same time, or to fit a cochlear implant and a hearing aid in the same ear at the same time. Both AB and MED-EL market software that makes fitting cochlear implants easier. AB asserts patents for fitting software against MED-EL as part of its counterclaims.

## B.    Procedural History

On October 3, 2018, MED-EL filed a complaint asserting that AB infringed two of its patents: U.S. Patent No. RE46,057 (the "'057 Patent") and U.S. Patent No. 8,634,909 (the "'909 Patent"). In response, AB asserted six of its own patents, including U.S. Patent No. 8,155,747 (the "'747 Patent"), U.S. Patent No. 7,076,308 (the "'308 Patent"), and U.S. Patent No. 8,270,647 (the "'647 Patent"). The Parties have since participated in multiple rounds

of *inter partes review* ("IPR"), which have invalidated a significant number of claims and patents.[1] The Parties filed motions for summary judgment on April 7, 2022.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A non-moving party asserting that a fact is genuinely disputed must support

---

[1] As a result of the IPR proceedings, I have dismissed claims about U.S. Patent No. 6,761,681, and I have stayed claims about U.S. Patent Nos. 7,267,847 and 8,155,746.

such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

**III.     MED-EL's MOTION**

**A.     '747 Patent**

The '747 Patent is titled "Electric And Acoustic Stimulation Fitting Systems And Methods" and "is directed to fitting systems and techniques that may be used to fit a variety of cochlear implants and a variety of hearing aids . . . during the same fitting session." ('747 Patent at 3:53-56.) Clinicians "fit" cochlear implants and hearing aids by modifying various parameters to ensure comfortable sound ranges. According to the

Patent, it was the first system and method that could simultaneously or sequentially modify parameters of both cochlear implants and hearing aids, or devices delivering electric stimulation and acoustic stimulation, for someone using both types of devices.

Following IPR proceedings, Claim 3 of the '747 Patent is the only asserted claim remaining in this case.  Claim 3 depends on (now-invalidated) Claim 1 and reads: "The system of claim 1, wherein: the computer is configured to communicate directly with at least one of the hearing aid, the cochlear implant speech processor, the electric elements of the electric-acoustic processor, and the acoustic elements of the electric-acoustic processor through wireless communications." Claim 1, in turn, recites:

> A system for modifying the parameters of acoustic and electric stimulation hearing devices, comprising:
>
>> A computer provided with access to software that is configured to communicate with and modify parameters of at least one of (a) a hearing aid and a cochlear implant speech processor and (b) the acoustic and electric elements of an electric-acoustic processor;
>>
>> Wherein the hearing aid and the acoustic elements of an electric acoustic processor and devices that are configured to generate or apply acoustic stimulation signals to acoustic sensing organs of the ear, the acoustic stimulation signals being sound waves directed into the ear canal;
>>
>> Wherein the cochlear implant speech processor and the electric elements of an electric-acoustic processor are devices that are configured to generate or apply electric stimulation signals to the auditory nerve of the ear, the electric stimulation signals being stimulation current applied to electrodes implanted within the cochlea of the ear;
>>
>> Wherein the hearing aid and the cochlear implant speech processor, or the acoustic and electric elements of the electric-acoustic

processor, are situated in the same ear and are configured to generate or apply both acoustic stimulation signals to the acoustic sensing organs of the ear and electric stimulation signals to the auditory nerve of the same ear.

MED-EL argues that Claim 3 is invalid under 35 U.S.C. § 101, which permits patents for the invention of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotations omitted). Courts must be careful when "construing this exclusionary principle" because, "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* at 217 (quotations omitted).

Courts determine whether a patent is invalid under § 101 under the two-step *Alice* framework. First, the court must "determine whether the claims at issue are directed to one of those patent ineligible concepts." *Id.* at 217 (citation omitted). If they are, the court must analyze the claims "both individually and as an 'ordered combination'" to determine whether there's any additional "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217-18 (same).

## 1.     Abstractness

To determine abstractness, courts ask "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292

(Fed Cir. 2020) (citations omitted). In doing so, courts "must focus on the language of the [a]sserted [c]laims themselves . . . considered in the light of the specification." *Id.* (same). The Federal Circuit has cautioned not to overgeneralize claims by analyzing them at "a high level of abstraction" that is "untethered from the language of the claims," lest "the exceptions to § 101 swallow the rule." *Id.* at 1293 (same). The analysis "depends on accurate characterization of what the claims require and of what the patent asserts to be the claimed advance." *Id.* at 1294.

"In cases involving software innovations, this inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool" *Id.* at 1293 (quoting *Uniloc USA, Inc. v. LG Electronics, Inc.*, 957 F.3d 1303, 1306-07 (Fed. Cir. 2020)). Software improvements are patent eligible if they are "directed at non-abstract improvements to the functionality of a computer or network platform itself." *Id.* The Federal Circuit instructs courts to ask "whether the focus of the claimed advance is on a solution to a problem specifically arising in the realm of computer networks or computers . . .; and whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." *Id.* (citations omitted).

The focus of the '747 Patent is to provide a "technique and system for programming, or fitting, a hearing device configured to deliver electric stimulation to a

7

patient and a hearing device configured to deliver acoustic stimulation to the patient"
('747 Patent at 3:46-49), with a particular aim of fitting both devices in the same ear. (*Id.*
at 15:51-57.) Claim 3 is a recitation of "components [that are] well-known and
conventional." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021). The inventive aspect of
that Claim is the introduction of wireless communication between a computer and the
other components for fitting. It does not resolve any problem regarding a computer's
communication with hearing devices and does not identify any specific improvements to
the device's capabilities or functionalities. Wireless communication between a computer
and various devices, without more, is an abstract concept. *See Chamberlain Grp., Inc. v.
Techtronic Indus. Co.*, 935 F.3d 1341, 1347 (Fed. Cir. 2019) ("[T]he broad concept of
communicating information wirelessly, without more, is an abstract idea).

AB's argument that the specification clarifies that the "system of Claim 3"
necessitates physical changes to the hardware, and therefore isn't abstract, is
unconvincing. Although the Claim recites a system, including its hardware components,
Claim 3 is not focused on the inner workings of the various hearing devices. It is focused
only on wireless communication between a computer and those components. Nothing in
the asserted claim or the specification ties the adaptations that AB raises to Claim 3, and
none of it makes Claim 3 any less abstract.

## 2.      Inventive concept

Because Claim 3 is directed to an abstract concept, it is only valid if it includes "an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention." *Yu*, 1 F.4th at 1045. There are two reasons that I find Claim 3 isn't sufficiently inventive. *First*, it "is recited at a high level of generality and merely invokes well-understood, routine, conventional components to apply the abstract idea." *Id.* The simple recitation of a computer wirelessly connecting with various pieces of hardware is not inventive. It does nothing to "transform" the claim beyond its focus. *See Alice*, 573 U.S. at 217. The abstract concept is the only concept contained in the asserted claim.

*Second*, there is no question that prior art incorporated wireless communication between a computer and various cochlear implant and hearing aid components. For example, although the PTAB found that the Anderson prior art[2] didn't anticipate the '747 Patent, it noted that Anderson did incorporate wireless technology. (*See* D.I. 227-7 at 12-14.) Elsewhere, the PTAB described how a prior art reference[3] allowed that implant to "communicate wirelessly with [the] programming system . . . and telemetry system." (*Id.* at 20.) Nothing in Claim 3 suggests anything more inventive than these concepts. Therefore, Claim 3 is not patent-eligible. It is invalid.

---

[2] U.S. Patent No. 5,721,783.
[3] U.S. Patent App. No. 2001/0031996 A1.

### B.   Non-Infringement Of The '308 And '647 Patents

Patent infringement occurs when a person "without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent." 35 U.S.C. § 271(a). "Determining infringement requires two steps: construing the claims and comparing the properly construed claims to the accused product." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316–17 (Fed. Cir. 2015). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019). Literal infringement is a question of fact. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1130 (Fed. Cir. 2011). As such, it is amenable to summary judgment when no reasonable factfinder could find that the accused product contains every claim limitation. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1339 (Fed. Cir. 2016).

Similarly, "[w]however actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To prove indirect infringement, "the patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 Fed. Cir. 2012) (citations omitted). Inducement occurs when there were "active steps taken to encourage direct infringement, which can in turn be found in advertising an infringing use or instructing how to engage in an infringing use." *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015)

(citations omitted). For induced infringement, describing the infringing mode is not the same as recommending, encouraging, promoting, or suggesting the infringing use. *Id.*

### 1.    The '308 Patent

The '308 Patent is directed at a "simplified method for fitting [] cochlear implant[s]." (*See* '308 Patent at 1:11-12.) The method requires "globally determining" a "T-Level," which I construed as "the lowest stimulation intensity that the patient can observe." (D.I. 98 at 4.) AB asserts that MED-EL's MAESTRO software for fitting cochlear implants infringes because its "THR parameter" performs the same function as a T-Level.

There are disputes of material fact that preclude summary judgment on this patent. For one, neither party agrees whether MAESTRO's THR parameter must be set below or just within the audible range. Expert testimony from the Parties suggests that it could be either. MED-EL also claims that its software allows clinicians to set the THR parameter at whatever level they choose, including below the audible range. However, it's unclear whether MED-EL induces them, either explicitly in its instruction manuals or through a default setting, to set the THR parameter at the minimally perceptible level, which might indirectly infringe the '308 Patent. There is sufficient evidence in the record for a reasonable jury to find that the MEASTRO system encourages clinicians to set the THR parameter at "the lowest stimulation intensity that the patient can observe." Therefore, I won't grant summary judgment.

### 2. The '647 Patent

Claim 1 of the '647 Patent teaches a "cochlear implant system," comprised in part of an "implanted antenna" and a "modular external headpiece." ('647 Patent at 10:55-61.) The Claim limits the headpiece to one that is "removably positioned over [the] implanted antenna by magnetic attraction with said implanted antenna such that a portion of skin is sandwiched between said implanted antenna and said modular external headpiece . . .." (*Id.* at 10:65-11:2.) AB claims that MED-EL's RONDO system infringes Claims 7-11 of the '647 Patent, which depend on Claim 1. Both the RONDO system and the Patent are inventions containing all of the components of a cochlear implant's external head piece in a single device.

MED-EL's device doesn't rely on magnetic attraction to the implanted antenna coil. Even AB agrees that the RONDO system uses an internal retention magnet to keep the external headpiece in place above it. Images of the implant show that a layer of silicone separates the magnet from the coil, such that it sits alone within the implant. (*See* D.I. 340 at 18-19.) Nonetheless, AB contends that those various parts comprise the "antenna" based on Federal Circuit case law that holds a claim element can be a combination of multiple structures. Certainly, the '647 Patent contemplates the possibility of the antenna containing both a coil and a separate magnet. Claim 1 requires magnetic attraction *with* the antenna, and the specification describes that attraction as being to either *a magnet*

or magnetic material *located within* the antenna. But the ultimate question is thus whether RONDO's retention magnet is *in* its antenna.

I find that the retention magnet is not a part of the antenna within the meaning of Claim 1 of the '647 Patent. The image of the RONDO device shows that a significant layer of silicone separates the magnet from the antenna coil. (*See id.*) It is neither interspersed within the coil itself nor encased within the same material. The layer of silicone insulates the magnet, so it can't be electronically coupled to the device's internal processor, which Claim 1 requires. (*See* '647 Patent at 10:59-60.) The magnet also doesn't add anything to the antenna's function. Instead, it has its own purpose of keeping the external headpiece in position. Practically, the magnet is an independent component that happens to be loosely encircled by a coil antenna. It is therefore different from sugar in a cake (which is AB's analogy) because it does not combine with other components to create a single, unitary output.

AB's expert says a POSITA would understand that RONDO's magnet is part of the antenna because the '647 Patent's specification says that the headpiece may be "attracted to a magnet . . . within the antenna," and points to element 187 in Figure 3 to illustrate. However, he cites no evidence beyond his own assertion that a POSITA would understand that there is a magnet at the center of Figure 3 that is incorporated into element 187 as part of the antenna. That *ipse dixit* is not enough to create a factual dispute for trial.

## IV.   AB's MOTION

### A.   The '909 Patent

#### 1.   Background of the '909 Patent

The '909 Patent relates to a rotatable magnet used in a cochlear implant. It discloses "[a]n implantable system for a recipient patient, the implantable system comprising: . . . a planar disc shaped first attachment magnet within the coil housing, the first attachment magnet adapted to be rotatable therein . . .." ('909 Patent at 7:44-45, 51-53.) MED-EL asserts that the shape of the first attachment magnet in AB's Ultra 3D Cochlear Implant System (the "Ultra 3D") infringes this patent.

The prosecution history of the '909 patent was short but fraught. Claim 1 of the original application claimed "a first attachment magnet within the plane of the coil housing, rotatable therein . . .." (D.I. 252-3 at 18.) Claims 3-7 of that application claimed various attachment magnet shapes, including a planar disk magnet (Claim 3), a cylindrical beam magnet (Claim 5), and a pair of complementary cylindrical magnets (Claim 7). The examiner rejected all of these claims as anticipated by U.S. Patent No. 6,838,963 (the '963 Patent"). (*Id.* at 36.)

MED-EL amended Claim 1 of its application to require "a planar disc shaped first attachment magnet." (*Id.* at 41.) It also amended Claims 3-7 so that those magnet shapes were limited to second attachment magnets. (*Id.* at 41-42.) In its remarks, MED-EL noted that the invention requires a "planar disc shaped first attachment magnet." (*Id.* at 44.) It

also argued that this the '963 Patent did not anticipate that invention because the '963 Patent required a spherical magnet that "must substantially protrude out from the main body of the implant housing." (*Id.* at 45.) In contrast, the planar disc shaped magnet would not protrude from a patient's skin or require a recess prepared in the patient's bone. The examiner again rejected all of the claims and found that the '963 Patent disclosed many of the magnet shapes in Claims 5-7.

Following a telephone interview with the examiner, MED-EL amended its application again but maintained the requirement of a planar disc shaped first attachment magnet. In its remarks, MED-EL explained that a "benefit of the attachment magnet configuration of the present invention, compared to the prior art spherical or cylindrical magnet configurations, is the slim housing profile." (*Id.* at 66.) The examiner agreed the Claims were "allowable over the prior art for reasons argued by the Applicant in the 'Remarks'" and allowed the '909 Patent to issue. (*Id.* at 75-76.)

### 2.    The accused product

The Ultra 3D is a cochlear implant that, like MED-EL's RONDO system, contains a rotatable magnet surrounded by silicone and a coil antenna. The magnet assembly is a combination of four cylindrical magnets, each wrapped in individual magnet sleeves and arranged side-by-side in a rotatable frame, which is encased in a flat, circular case. Of these components, only the four cylindrical magnets are magnetic. No other piece of the assembly contains a magnet.

### 3.     Estoppel

MED-EL claims the Ultra 3D literally infringes every claim of the '909 patent except for the shape of the magnet. It claims that the magnet infringes under the doctrine of equivalents because the magnet assembly results in a planar disc shape. Broad application of the doctrine of equivalents "conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Eli Lilly and Co. v. Hospira, Inc.*, 933 F.3d 1320, 1330 (Fed. Cir, 2019) (citations omitted). Unchecked, the doctrine may "take on a life of its own, unbounded by the patent claims." *Id.* (cleaned up). Therefore, courts developed doctrines to limit a patentee's ability to assert infringement under the doctrine of equivalents. *Id.*

"Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (citations omitted). The concept "reflects the fact that the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 741 (2002). There are two types of prosecution history estoppel: amendment-based and argument-based. *Pharma Tech*, 942 F.3d at 1380. Under either theory, there is a "presumption that estoppel bars a claim of equivalence," and it is the patentee's burden to rebut it. *Festo*, 535 U.S. at 741.

### a.    Amendment-based estoppel

Narrowing amendments during patent prosecution are "presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Id.* at 740. A patentee can rebut the presumption by showing any of: (1) the equivalent was "unforeseeable at the time of the application;" (2) the rationale for the amendment was only tangential to the equivalent; or (3) there's another reason that suggests "the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 740-41. MED-EL narrowed Claim 1 during prosecution of the '909 Patent when it amended it to require "a planar disc shaped first attachment magnet" instead of "a first attachment magnet." Therefore, it must rebut the presumption that it surrendered cylindrical first attachment magnets by showing that the surrender of those designs fits into one of the exceptions to prosecution history estoppel. MED-El attempts to argue the amendment fits into the "tangential relation" and "unforeseeable" exceptions. I find that those exceptions don't apply to these amendments.

### i.    Tangential relation exception

"The tangential relation inquiry focuses on the patentee's objectively apparent reason for the narrowing amendment, which should be discernable from the prosecution history record." *Pharma Tech*, 942 F.3d at 1380. "[A]n amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1369

(Fed. Cir. 2003). The Federal Circuit requires a "strong showing" to satisfy the "very narrow" tangential relation exception. *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1359 (Fed. Cir. 2012) (citations omitted).

The prosecution history for the '909 Patent shows the rationale for limiting the claims to a flat planar magnet was to address concerns about the magnet's shape. MED-EL argues that the accused equivalent is tangential to the rationale for amending because the purpose of the amendment was to distinguish over the spherical magnet of the '963 Patent, which protruded from the housing of the main implant. There are two problems with that argument, though. *First*, MED-EL's argument takes a too-restrictive view of the reason for narrowing. MED-EL would have me conclude that the only distinction that matters to this analysis was between a spherical magnet and other shapes and classify anything else as tangential. But "tangential" means more than not exactly the same. In ths case, a dispute about the shape of the magnet is not tangential to the limit to the shape of the magnet, even if it's not exactly the same. *Second*, MED-EL's argument is factually wrong because Figure 9 of the '963 Patent addresses cylindrical magnets housed in a flat planar casing. (*See* D.I. 252-3 at 49.) After the examiner cited the '963 Patent, MED-EL responded that its claimed magnet was an improvement over *both* spherical and cylindrical magnet configurations and distinguished Figure 9, which shows a cylindrical first attachment magnet. (*Id.* at 65-67.) Therefore, MED-EL's amendment was made partially to avoid prior art disclosing cylindrical magnets, and the decision to disclaim

them was not tangential to the rationale for the amendment limiting the invention to a flat planar first attachment magnet.

### ii.   Unforeseeable exception

"An equivalent is foreseeable if one skilled in the art would have known that the alternative existed in the field of art as defined by the original claim scope, even if the suitability of the alternative for the particular purposes defined by the amended claim scope were unknown." *Festo Corp v. Shoketsu Kinzoku Kogoyo Kabushiki Co.*, 493 F.3d 1368, 1382 (Fed. Cir. 2007). An alternative is also foreseeable if it is "disclosed in the pertinent prior art in the field of invention" or is "known in the field of invention as reflected in the claim scope before amendment." *Id.* at 1379.

As noted, the '963 Patent disclosed cylindrical magnets in a flat planar casing. That suggests that the alternative was foreseeable, even if what was in the '963 Patent wasn't exactly the same. As a result, when MED-EL limited its claims, it was foreseeable that it was giving up a claim for cylindrical magnets in a flat casing. MED-EL argues that it didn't distinguish cylindrical magnets until after it narrowed the claims, but its original claims embraced an attachment magnet consisting of two cylindrical magnets, and MED-EL relinquished those claims while prosecuting the patent to avoid the same prior art. Ultimately, MED-EL's arguments are not enough to invoke this limited exception.

### b.  Argument-based estoppel

"Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may" create argument-based prosecution history estoppel. *Pharma Tech*, 942 F.3d at 1380 (cleaned up). For estoppel to attach, "the prosecution history must evince a clear and unmistakable surrender of subject matter." *Id.* (same). "The inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.* (same).

Argument-based estoppel applies because MED-EL's statements disclaimed cylindrical shaped magnets. After amending Claim 1 to include the "planar disc shaped first attachment magnet" limitation, MED-EL argued that the claims were "directed to a novel and inventive magnetic arrangement for an implantable system," in part because it included "[a] planar disc shaped first attachment magnet." (D.I. 252-3 at 44.) MED-EL also pointed to figures incorporating planar disc shaped magnets, but not cylindrical magnets, as examples of why that configuration was beneficial. After the examiner rejected Claim 1 a second time, and the examiner pointed to a configuration including a cylindrical magnet that appeared to meet the Claim's limitations, MED-EL argued the planar disc configuration improved on "prior art spherical or cylindrical magnet configurations." (*Id.* at 66.) The argument MED-EL made differentiating both types of magnets the second time around was identical to the arguments it made differentiating spherical magnets

20

after its first amendment. Based on these statements, a competitor would reasonably believe MED-EL had surrendered cylindrical magnet configurations.

Because I agree that prosecution history estoppel applies to MED-EL's arguments, MED-EL can't sustain a claim that the Ultra 3D infringes the '909 Patent under the doctrine of equivalents. Therefore, I won't reach AB's alternative arguments regarding the disclosure dedication rule and the '909 Patent's dipole moment limitation.

### B.    Claim 19 Of The '057 Patent

#### 1.    Background of the '057 Patent

Unlike the '909 Patent, Claim 19 of the '057 Patent does claim "[a] hearing implant system comprising: . . . an implantable portion including an implant housing containing: . . . a *cylindrical-shape* implant holding magnet having a rotational cylinder axis and adapted to be freely turnable within the implant housing . . .." ('057 Patent at 14:25, 32-33, 36-38 (emphasis added).) The prosecution history of the '057 Patent spans thirteen years. The application for its parent patent was filed as Application No. 10/405,093 (the "'093 Application"). The '093 Application included an independent claim for an implant comprised of "at least one magnet free to turn in the housing," and dependent claims where at least one of those magnets was spherical or cylindrical. (D.I. 245-8 at 11-12.) The examiner placed a restriction requirement that identified ten species of the claimed invention and required MED-EL to elect one of them. MED-EL elected species VIII, which claimed only spherical magnets. The Patent issued as U.S. Patent No. 6,838,963.

MED-EL filed a divisional application to try to recapture subject matter that it surrendered in the prosecution of the '093 Application. That divisional application resulted in U.S. Patent No. 7,091,806 (the "'806 Patent"). The '806 Patent claimed various magnetic switches and a cochlear implant that incorporated those switches. Claim 4 discloses a magnetic switch incorporating a cylindrical magnet. (*See* '806 Patent at 14:4-5.)

MED-EL filed a continuation of that application. Application No. 11/475,705 (the "'705 Application") contains an independent claim for an implant that includes "at least one magnet free to turn in the housing" and dependent claims for one or more spherical or cylindrical magnet. Like the '093 Application, the examiner placed a restriction requirement on the '705 Application and required MED-EL to elect one of ten species. MED-El elected the species incorporating spherical magnets and canceled the claims related to cylindrical magnets. The patent issued as U.S. Patent No. 7,566,296.

MED-EL never filed a divisional application to recapture anything that it from the '705 Application. Instead, it filed two continuations, which resulted in U.S. Patent No. 8,118,725 (the "'725 Patent"). The independent claims of the '725 Patent disclose "a magnet held by a housing" and a "second magnet held by a second housing." (*See* '725 Patent at 13:1, 14:14.) The only dependent claims regarding magnet shape disclose a spherical magnet. (*See Id.* at 13:30-31. 14:21-22.)

MED-EL sought reissue of the '725 Patent to add claims disclosing cylindrical magnets. Again, the examiner placed a restriction requirement noting two distinct species:

one with a magnet that was "freely turnable in any direction;" and one that was "freely turnable about rotational cylindrical axis." (D.I. 245-12 at 17). MED-EL responded by canceling the claims incorporating cylindrical magnets but noted they were included because the original patent didn't cover them. This time, MED-EL Filed a divisional application to cover a cylindrical magnet configuration, which resulted in the '057 Patent.

### 2.    Prosecution history estoppel

AB argues that prosecution history estoppel attaches to the '057 for much the same reasons as the '909 Patent. I agree. MED-EL originally claimed only "a magnet" in the '725 Patent and sought reissue—and then filed a divisional application—to add claims for a cylindrical magnet. This narrowing amendment was the purpose of the reissue. Claim 19 discloses only a single cylindrical magnet, and MED-EL cannot argue that an arrangement of multiple cylindrical magnets was unknown at the time it filed the application because it sought claims covering arrangements of multiple cylindrical magnets in the earlier prosecution of the '705 Application. Having excluded multiple cylindrical magnets, MED-EL cannot now claim that an arrangement of four cylindrical magnets is an equivalent of the '054 Patent.

## V.    CONCLUSION

The Court will grant summary judgment on all but MED-EL's motion regarding non-infringement of the '308 Patent. An appropriate Order follows.

**BY THE COURT:**


*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

February 23, 2023