**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **MED-EL ELEKTROMEDIZINISCHE GERATE GES.M.B.H.,** | |
| *Plaintiff,* | **Case No. 1:18-cv-01530-JDW** |
| v. | |
| **ADVANCED BIONICS, LLC, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

The losing party bears a heavy burden to reverse a jury's verdict or get a new trial. MED-EL wants to do just that and is within shouting distance of carrying that burden. It has shown that AB didn't have the evidence to support two of its theories of patent infringement.[1] The problem is, it has to show that AB lacked support for **all** of its theories, not just some. MED-EL hasn't made it that far, so I will permit the jury's verdict to stand. While the overall circumstances of this case do not warrant enhanced damages or attorneys' fees, I will award AB supplemental damages, an ongoing royalty, and both pre- and post-judgment interest to compensate it for MED-EL's infringement.

---

[1]      "MED-EL" refers to MED-EL Elektromedizinische Geräte Ges.m.b.H and MED-EL Corporation, USA. "AB" refers to Advanced Bionics LLC, Advanced Bionics AG, and Sonova AG.

# I.    RELEVANT BACKGROUND

## A.    Procedural History

This case began on October 3, 2018, when MED-EL filed a Complaint against Advanced Bionics, LLC, asserting that Advanced Bionics infringed two of its patents: U.S. Patent Nos. RE46,057 (the "'057 Patent") and 8,634,909 (the "'909 Patent"). Weeks later, AB counterclaimed, asserting that MED-EL infringed U.S. Patent Nos. 6,761,681 ("the '681 Patent"), 8,155,747 ("the '747 Patent"), 7,076,308 ("the '308 Patent"), and 8,270,647 ("the '647 Patent"). AB later amended its counterclaims to assert two additional patents: U.S. Patent Nos. 8,155,746 ("the '746 Patent") and 7,267,847 ("the '847 Patent"). Though AB asserted claims of induced and contributory infringement as to both the '308 and '647 Patents, it did not break its "Infringement" Counterclaims into separate counts, depending on the different types of infringement.  (D.I. 49 at Seventh & Eighth Counterclaims.)

MED-EL and AB are competitors who manufacture, market, and sell cochlear implants and accompanying products. The patents in suit relate in some way to cochlear implants. The '647 Patent teaches a cochlear implant system, and the '308 Patent claims a method for fitting patients with cochlear implants. Specifically, Claim 2 of the '308 Patent requires:

> A method of fitting a bionic ear implant having an electrode array with multiple electrode contacts through which electrical stimulation may be applied to the patient's cochlea; the method comprising:
>
> measuring M-levels associated with a stimulus ..., where an M-level comprises a comfortable stimulation intensity;

> globally determining a T-level for all of the electrode contacts, where a T-level comprises a minimally perceptable [sic] stimulation intensity; and
>
> ... wherein globally determining a T-level comprises setting the T-level to a Value that is a prescribed fraction of the measured M-level.

(Ex. 1 at 14:40-55.[2]) Claim 3 depends from Claim 2 and adds an additional limit: "wherein setting the T-level to a prescribed fraction of the measured M-level comprises setting the T-level to be 1/10 of the measured M-level." (*Id.* at 15:6-8.)

The Parties asked me to construe the term "T-Level comprises a minimally perceptable [sic] stimulation intensity" as part of the claim construction proceedings in this case. For that term, MED-EL proposed the following construction: "The minimum stimulation current which when applied to a given electrode associated with the channel produces a sensed perception of sound at least 50% of the time." (D.I. 98 at 4.) AB argued that the term did not require a construction but proposed, in the alternative: "T-Level comprises a level of stimulation intensity that is near the lower end of what a patient is able to perceive as sound." (*Id.*) I rejected both Parties' proposed constructions and construed the term to mean "T-Level comprises the lowest stimulation intensity that the patient can observe." (*Id.* at 4-5.) Although I did not adopt either proposal, my construction is closer to AB's alternate proposal.

---

[2]    All citations to "Ex." refer to exhibits admitted at trial.

The Parties participated in multiple rounds of *inter partes* review ("IPR"), which invalidated a significant number of claims and patents. Following discovery, the Parties moved for summary judgment on most of the remaining issues. I granted summary judgment on several arguments. Following that ruling, AB's counterclaims of infringement of Claims 2-3 of the '308 Patent and Claims 16, 19, and 21 of the '647 Patent survived and proceeded to trial.

### B.    Pre-Trial Matters

Less than a month before trial, MED-EL served a supplemental damages report that included a new theory of damages for the '308 Patent. As a result, AB filed a 2-page motion to strike the supplemental report. Three days later, I granted the motion, noting that MED-EL had "attempted to take advantage of a limited opportunity to update damages figures with current sales data to include a new damages calculation." (D.I. 424 at 3.) However, I did not find any bad faith on MED-EL's part, and AB did not argue otherwise.

In addition, both Parties filed motions *in limine* in advance of trial, and my rulings were a mixed bag—AB prevailed on some; MED-EL prevailed on others. A portion of AB's motion sought to prevent MED-EL from introducing previously undisclosed invalidity defenses as to the '308 Patent and testimony to support those defenses. I granted the motion in part, ruling that MED-EL's witnesses could not testify as to this issue. In doing so, I noted that AB did not accuse MED-EL of bad faith, and I did not see any evidence of

misconduct either. Though MED-EL sought reconsideration of that ruling, AB did not have to expend further resources to respond to that motion because my Policies and Procedures prohibited it from doing so absent an Order from me. As a result of my ruling, MED-EL abandoned its invalidity defense as to the '308 Patent and did not present any evidence or argument about invalidity at trial.

I also ruled that MED-EL could not present an undisclosed invalidity opinion based upon its Tempo+ product, but its expert could opine that U.S. Patent No. 5,948,006 ("Mann '006") (in combination with other prior art) rendered the '647 Patent obvious. Despite my ruling, MED-EL's expert did not go so far at trial. Instead, he testified that Mann '006 demonstrated the motivation to combine other prior art references.

### C.    Trial[3]

#### 1.    The '308 Patent

The '308 Patent issued on July 11, 2006, and it claims, among other things, a simplified and improved method of fitting cochlear implants whereby audiologists globally determine the lower limits of the audible range, referred to as the T-level or threshold level, as a percentage of the upper limits of the audible range, called M-level. In its own patent application, MED-EL described the '308 Patent as "an improved method

---

[3]    This factual recitation describes the evidence that AB and MED-EL presented to the jury in support of their claims and/or defenses at trial.

for determining and adjusting the particular stimulation currents required." (Ex. 135.00003.) MED-EL knew about the '308 Patent at least as of August 24, 2007.

MED-EL provides its MAESTRO software to audiologists, who then fit patients with MED-EL's cochlear implants. Audiologists use MAESTRO to set both the M-level—which MED-EL refers to as "MCL" (the maximum comfort level)—and the T-level—which MED-EL refers to as "THR" (threshold level). Audiologists can determine a patient's MCL levels by measuring them through subjective feedback from patients or using objective measures, like an Electrically Evoked Stapedius Reflex Test ("eSRT"). They use objective measures for small children and other patients who cannot provide subjective feedback.

To set THR levels using MAESTRO, audiologists can measure THR as to each individual electrode in an implant, using subjective feedback, or they can set the THR levels on a global basis by setting them to a percentage of the MCL level using a "Lock THR" function. Setting THR on a global basis, as a percentage of MCL, is quicker than measuring the individual electrodes. In fact, Darla Franz, MED-EL's Vice President of Strategy, Learning, and Communication, described manual measurement of THR values as a "time waster." (Ex. 235.00008.)

Since at least 1997, MED-EL has taught audiologists to set THR levels globally to 10% of the MCL, and MED-EL had been planning to introduce the Lock THR feature in the MAESTRO software since February 2006. In 2017, MED-EL enabled the Lock THR function as a default setting in MAESTRO. In the 2018 version of MAESTRO, MED-EL set the Lock

THR to 10% of MCL, but it changed that setting to 8% in the 2019 version of the software. MED-EL's witness testified that "there was no technical reason" for this change. (D.I. 437-1 at 147:11.) Instead, the change was based on "input from [MED-EL's] counsel." (*Id.* at 147:05.)

Based on its experience and research, MED-EL tells audiologists that setting the THR to a value of 10% of the MCL will result in a level that is inaudible to patients. In fact, in its MAESTRO fitting guides, MED-EL instructs audiologists that THR should be an inaudible level. For example, MED-EL's Fitting Guide for First Fitting Opus 1 or Opus 2 with MAESTRO 2.0 describes says the following about THR levels:

- "THR is the level **slightly below** the level that the stimulus is audible[;]"

- "[R]educe the THR value ... to be sure that the patient **no longer hears** the sound[;]"

- "Reduce the THR values and make sure that all THR values are **below the audible range**.")

(Ex. 18 at 16 (emphasis added).) And AB's infringement expert, Dr. Gerald Popelka, testified that audiologists would understand MED-EL to be instructing audiologists to set THR to an inaudible level. MED-EL instructs audiologists to do it this way because if the THR is set to an audible level, then the patient will hear an uncomfortable buzzing or humming noise.

Dr. Popelka testified that audiologists define audibility in a different way than laypeople do. Audiologists do not draw the line between audibility and inaudibility at the point where a patient hears no sound at all. Instead, audiologists use a 50% threshold. To measure audibility, an audiologist will present a sound to a patient ten times. If the patient hears the sound five times, or 50% of the time, then the sound is considered audible. However, if the patient hears the sound just four times, or 40% of the time, then the sound is deemed inaudible even though the patient can hear it some of the time. Both Ms. Franz and MED-EL's non-infringement expert, Dr. Doug Sladen, confirmed that this is how audiologists determine whether a sound is audible. (*See* D.I. 439 at 391:17-20, 478:15-20.)

While MED-EL is confident that setting the THR as 10% of the MCL will be in the inaudible range, it does not know "how far below audible it might be." (D.I. 439 at 359:11.) Likewise, Dr. Popelka acknowledged that "[a] signal can be a little bit below the threshold or it can be very much below the threshold." (D.I. 438 at 228:12-19.) And he opined that audiologists would not understand MED-EL to be instructing them to set the THR values anywhere within the inaudible range. Instead, audiologists would understand MED-EL to be instructing them to set THR "just below" the 50% threshold. (*Id.* at 228:24.) According to Dr. Popelka, "[t]here's really no difference between the two, between just hearing it and just not hearing it. ... There's really no difference between just you can hear and just you can't hear. Very, very tiny." (*Id.* at 235:6-16.)

Unlike MED-EL's fitting guides, other MED-EL documents use a different definition for THR. For example, a MED-EL engineering document defined THR value as "the current levels eliciting just audible ... acoustical sensations ...." (Ex. 23.00090.) In *Handbook for Educators: Teaching Children Who Listen With a Cochlear Implant*, MED-EL explains that the threshold setting is abbreviated as "THR," and it describes threshold as both "the level at which a person hears a sound 50% of time" and also "the softest level of electrical stimulation a child can perceive." (Ex. 234 at 75.) MED-EL does not distribute either document to audiologists for fitting cochlear implants.

When Ms. Franz heard about AB's infringement suit against MED-EL, she was "surprised," because MED-EL had been "doing this for many years already." (D.I. 439 at 383:20-23.) Ms. Franz also testified that has never read the '308 Patent and only learned of its existence once she became aware of this lawsuit. She has difficulty understanding patents and does not need to read them as part of her job, which involves training surgeons, audiologists, and therapists regarding MED-EL's cochlear implants. MED-EL's other witnesses, Werner Oberhauser and Martin Kerber testified that they did not investigate when MED-EL became aware of the '308 and '647 Patents.

AB presented evidence from Julie Davis, a damages expert, who estimated a royalty rate for the '308 Patent based on the number of sound processors that MED-EL sold and accounting for the time and salary savings that audiologists realized from the efficiency of globally setting T-Levels during patient fitting.

### 2.    The '647 Patent

During trial, AB presented evidence that MED-EL's manufacture, sale, and/or use of the RONDO sound processor infringes the '647 Patent. MED-EL offered no contrary evidence. As a result, AB moved for JMOL following MED-EL's case-in-chief, and I granted that motion. In opposing the motion, MED-EL could not point to any evidence in the record to support its non-infringement defense. The jury returned a verdict for AB in the amount of $80,122 due to MED-EL's infringement of the 647 Patent.

As part of its willfulness case, AB presented evidence that MED-EL knew about the '647 Patent as of September 18, 2012—the same day it issued. For its part, MED-EL put forth evidence that it was developing the RONDO a year prior, in August 2011. MED-EL sold the RONDO from April 2013 until 2020. In addition, MED-EL put on some evidence in support of its obviousness defense, but the jury determined that MED-EL failed to prove that any of the claims of the '647 Patent are invalid as obvious in light of prior art.

### 3.    The verdict

At the conclusion of the trial, I submitted to the jury, without objection, a verdict form that sought a general verdict on each of AB's claims of infringement. (D.I. 430.) That is, I did not ask the jury to specify the theories on which it found infringement and the theories that it rejected. The jury determined that MED-EL indirectly infringed Claims 2 and 3 of the '308 Patent. It also concluded that MED-EL's infringement was willful. However, the jury adopted MED-EL's expert's calculation of damages and awarded

$1,363,119 to AB as a result of MED-EL's infringement of the '308 Patent. The jury also determined that MED-EL's infringement of the '647 Patent was willful and awarded AB $80,122 in damages.

### D.    Post-Trial Motions

Following the entry of judgment, both Parties filed post-trial motions. MED-EL seeks JMOL as to AB's claims of infringement of the '308 Patent, its claims of willfulness as to both the '308 and '647 Patent, and its claim for damages as to the '308 Patent. In the alternative, MED-EL moved for a new trial on the same issues. In its own post-trial motion, AB seeks enhanced damages, attorneys' fees, supplemental damages, an ongoing royalty, and both pre- and post-judgment interest. Both motions are ripe for disposition.

## II.    LEGAL STANDARDS

### A.    JMOL

The Federal Rules of Civil Procedure permit a court to enter judgment as a matter of law against a non-moving party before the case is submitted to the jury where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue[.]" Fed. R. Civ. P. 50(a)(1)(B). Where, as here, the court denies a motion under Rule 50(a), the movant may file a renewed motion for JMOL after trial. *See* Fed. R. Civ. P. 50(b). In patent cases, district courts apply the law of the regional circuit to JMOL motions. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019).

In the Third Circuit, post-trial motions for JMOL are granted "sparingly" and only where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (quotation omitted). Thus, such motions "may be granted 'only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Mancini v. Northampton Cnty.*, 836 F.3d 308, 314 (3d Cir. 2016) (quotation omitted). In resolving the motion, a court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Id.* (same).[4]

### B.   New Trial

Where a court denies a motion for JMOL under Rule 50(a), the movant may request a new trial under Rule 59. *See* Fed. R. Civ. P. 50(b). Rule 59 permits a court to grant a new trial on all or some of the issues for any reason for which a federal court has granted a new trial. *See* Fed. R. Civ. P. 59(a)(1)(A). In patent cases, district courts apply the law of the

---

[4]      MED-EL relies on a slightly different standard, citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1326 (Fed. Cir. 2016) and *Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, No. 18-cv-462, 2020 WL 1443215, at *2 (D. Del. Mar. 24, 2020), neither of which cited a case from the Third Circuit for the applicable standard. After tracing the various case citations in these cases and the cases they cite, it appears that the "substantial evidence" standard on which MED-EL relies on stems from the Fifth and Eleventh Circuits. *See Mfg. Rsch. Corp. v. Graybar Elec. Co.*, 679 F.2d 1355, 1361 (11th Cir. 1982) (citing *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 767 (5th Cir. 1980)). In any event, the two standards do not appear all that different, as substantial evidence is defined as "such relevant evidence that a reasonable mind might accept as adequate to support the finding under review." *Gavrieli*, 2020 WL 1443215 at *2.

regional circuit to motions for a new trial. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1326 (Fed. Cir. 2016).

In the Third Circuit, a court should grant a new trial "only when 'the great weight of the evidence cuts against the verdict and … [ ] a miscarriage of justice would result if the verdict were to stand[.]'" *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quotation omitted); *see also Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). Again, the court may "not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Leonard*, 834 F.3d at 386.

## III.    ANALYSIS

### A.    Liability

In its response to MED-EL's JMOL motion, AB argues that, in light of the jury's general verdict, I should deny MED-EL's motion if the jury had substantial evidence to support its conclusion as to any of AB's infringement theories. (D.I. 451 at 8.) MED-EL does not respond to that argument, so I will treat it as conceded. *See Noramco LLC v. Disman USA, Inc.*, No. 21-cv-1696, 2022 WL 2817876, at * 5 (D. Del. July 19, 2022) (Bryson, J.); *see also Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005).[5]

---

[5]    Because MED-EL has not addressed this issue, I will not reach it because it is "for the *parties*—not the court—to chart the course of the litigation." *Astellas Pharma, Inc. v. Sandoz, Inc.*, -- F.4th --, 2024 WL 4219374, at * 5 (Fed. Cir. Sept. 18, 2024) (emphasis in original). That said, there is some question of whether AB is correct. In a criminal case, the Supreme Court has held that a general verdict of guilty did not need to be set aside "merely on the chance … that the jury convicted on a ground that was not supported by

### 1.    The '308 Patent

### a.    AB presented enough evidence to justify the jury's determination that MED-EL induced audiologists to infringe literally

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To prevail on a claim for induced infringement, a patent owner must demonstrate that a third party directly infringed and that the alleged infringer induced that infringement with knowledge that the induced acts constituted patent infringement. *See Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4fth 1370, 1377 (Fed. Cir. 2024). Direct infringement can take the form of literal infringement or infringement under the doctrine of equivalents. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).

### i.    Direct infringement

"[W]here an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement." *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1379 (Fed. Cir. 2020) (quotation omitted). "Literal infringement exists if each of the limitations

---

adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Griffin v. United States*, 502 U.S. 46, 59-60 (1991). The Federal Circuit has predicted that the Third Circuit would apply *Griffin* in civil cases, but the Third Circuit has not yet done so and, even after *Griffin*, has expressed a different view for civil cases (albeit in dicta). *Compare Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1338 (Fed. Cir. 2011) *with Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 409 (3d Cir. 2016) and *S.E.C. v. Teo*, 746 F.3d 90, 99 (3d Cir. 2014).

of the asserted claim(s) read on, that is, are found in, the accused device." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995).

Claim 2 of the '308 Patent requires "globally determining a T-level for all of the electrode contacts, where a T-level comprises a minimally perceptable [sic] stimulation intensity." (Ex. 1 at 14:40-55.) There's no dispute that audiologists use MAESTRO software to set the T-level (or THR) globally for all electrode contacts, and there was evidence to that effect at trial. MED-EL's argument focuses on the limit that requires a minimally perceptible stimulation intensity, which I construed to mean the "lowest stimulation intensity that the patient can observe." (D.I. 98 at 4-5.)

There was very little evidence at trial that might establish whether the THR level is the lowest stimulation intensity a patient can observe, but there was some. One of the few pieces of evidence directed to that issue was MED-EL's *Handbook for Educators*, which defines THR as "the softest level of electrical stimulation a child can perceive." (Ex. 234 at 75.) That is, the *Handbook* provided the jury with evidence that MED-EL's internal understanding of a THR level is the softest level that a user can perceive, which is consistent with my construction of the claim language. The jury was free to credit that document and to conclude that when audiologists set a THR level, they literally infringe.

MED-EL suggests that the jury could not rely on the *Handbook* because MED-EL did not give the *Handbook* to audiologists who perform fittings. But that misses the point. There's no doubt that audiologists set a THR level globally, as a percentage of the MCL

level, when they fitted patients with MED-EL's products. And the *Handbook* allowed the jury to conclude, based on MED-EL's own understanding of the THR level, that an audiologist who set the THR level was setting the "softest level of stimulation that a [user] can perceive." (*Id.*) That's all the jury needed to find literal infringement.

MED-EL's attempt to discount the *Handbook* is at odds with the claim language at issue, which requires that an audiologist sets a T-level globally "**where** a T-level comprises a minimally perceptable [sic] stimulation intensity." (Ex. 1 at 14:40-55 (emphasis added).) That phrase is definitional—it defines what a T-level is. The question is whether the THR level that audiologists set with MED-EL's MAESTRO software meets that definitional claim element. The *Handbook* gave the jury a basis to conclude that it did. Nothing about the claim language requires audiologists to make their own determination that the THR that they set is, in fact, the minimum level that a user can perceive.

The other evidence at trial did not contradict this point because it focused on whether a certain stimulation level would be audible or inaudible. During trial, both AB's and MED-EL's experts agreed that a patient can perceive sounds that audiologists classify as "inaudible." In other words, the jury had significant evidence that "inaudible" does not mean no sound whatsoever, at least as far as audiologists are concerned. Because the testimony before the jury was that the terms "audible" and "inaudible" were not linked to the lowest stimulation that a user could actually observe, the jury was free to disregard or discount the testimony about the audible/inaudible standard.

Even if the jury did not disregard the evidence about the audible/inaudible standard, the evidence was ambiguous and left room for the jury to find direct infringement. MED-EL instructs audiologists to set a THR level at an inaudible level. Dr. Popelka testified that that level could be close to the 50% level or could be well below it. If it were close to 50%, then it could be well above the lowest level the user can perceive. But if it were well below 50%, then it might be at that lowest level. The jury could have inferred that a level close to an audible level was more than the minimum level to observe, but it didn't have to reach that conclusion, particularly considering the *Handbook*'s statement to the contrary. It was the jury's decision how to resolve that ambiguity, and MED-EL has not demonstrated that I should disturb the jury's resolution of that issue.

Finally, Dr. Popelka's testimony does not change this outcome. He testified that audiologists would understand that MED-EL instructed them to set the THR level just below the threshold for audible—*i.e.*, as close to 50% perceptibility as possible. If the jury credited that testimony, then it probably should have concluded that MED-EL did not infringe because its instructions directed audiologists to set the THR level higher than minimal perceptibility. But the jury didn't have to credit Dr. Popelka's testimony in the face of contrary evidence in the *Handbook*. In light of this evidence, the jury had a basis for its verdict, and that decision does not shock the conscience to warrant a new trial.

### ii.   Inducement

In addition to showing that audiologists commit direct infringement, AB had to prove that MED-EL "knowingly induced infringement and possessed specific intent to encourage [audiologists'] infringement." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1351 (Fed. Cir. 2022) (quotation omitted). "[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (quotation omitted). "[K]nowledge of infringement can be inferred from circumstantial evidence." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016) (citation omitted). AB presented sufficient evidence at trial for the jury to make this finding.

There is no dispute that MED-EL knew about the '308 Patent "at least as of August 24, 2007." (D.I. 438 at 303:22-23.) In fact, AB presented evidence that a year after the '308 Patent issued, MED-EL described it as "an ***improved method*** for determining and adjusting the particular stimulation currents required" in its own patent application. (Ex. 135.00003 (emphasis added).) This suggests a few things: (a) MED-EL monitored AB's patents; (b) MED-EL reviewed the method that the '308 Patent (including Claims 2 and 3) describes; and (c) MED-EL also ***evaluated*** the merits of that method. In addition, the jury heard testimony that MED-EL has just two competitors in the cochlear implant industry

and—"of course"— MED-EL "analyze[s] what [its] competitors have and what that might mean for clinicians." (D.I. 439 at 393:5-7.)

Finally, a MED-EL witness testified that between MAESTRO Version 8.0 and Version 9.0, MED-EL changed the Lock THR function from 10% of the MCL to 8% of the MCL based on input from MED-EL's counsel. Indeed, this witness confirmed that "there was no technical reason" for this change. (D.I. 437-1 at 147:11.) This was sufficient evidence for a jury to infer that MED-EL knew that setting the lock feature to 10% of the MCL infringed Claim 3 of the '308 Patent. Taken together, this circumstantial evidence allowed the jury to find that MED-EL had the intent to induce audiologists to infringe the '308 Patent.

MED-EL's evidence as to other uses of MAESTRO did not prevent the jury from inferring MED-EL's intent to induce infringement. First, the jury was free to determine that using MAESTRO to measure and set THR levels for the individual electrodes (as opposed to globally setting them) was not a substantial non-infringing use because there was plenty of testimony during trial that it saves time to set the THR value globally as a percentage of the MCL. Indeed, MED-EL's expert agreed that in early cochlear implants, measuring individual T-levels was a painstaking and time-intensive task. In a presentation on behalf of MED-EL, Ms. Franz also characterized measuring the true threshold (THR) values as a "time waster." (Ex. 235.00008.) Given all this, the jury was free to conclude that using MAESTRO to individually measure THR values was ***not*** a substantial non-infringing use because doing so would be "unusual, far-fetched, illusory, impractical, occasional,

aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).

Likewise, it is not clear that MED-EL established that audiologists' use of an eSRT in MAESTRO is a substantial non-infringing use. While Dr. Sladen testified that it was his opinion that setting MCL values using an eSRT task and then setting the THR based on a percentage of the MCL would not infringe, he offered no explanation for that opinion. Thus, even if AB did not rebut Dr. Sladen's opinion, the jury was free to discredit it as nothing more than an expert's *ipse dixit*. Given MED-EL's weak evidence as to substantial non-infringing uses of MAESTRO, the jury was free to infer MED-EL's intent to induce audiologists to infringe.

> **b.    AB did not produce enough evidence to sustain a jury verdict based on the doctrine of equivalents or contributory infringement**

My conclusion that the evidence supported the jury's verdict based on AB's theory of induced literal infringement is enough for me to deny its JMOL and new trial motions. However, I will also address the evidence on the other infringement theories that AB advanced: induced infringement based on the doctrine of equivalents and contributory infringement.

> **i.    Doctrine of equivalents**

The doctrine of equivalents requires that an accused product contain each limitation of a claim or its equivalent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,

520 U.S. 17, 40 (1997). An element in an accused product is equivalent to a claim element if the differences between the two are insubstantial to one of ordinary kill in the art. *See Cortland Line Co. v. Orvis Co., Inc.*, 203 F.3d 1351, 1359 (Fed. Cir. 2000).

According to AB, its infringement theory at trial was "even if MAESTRO's THR was not literally 'the lowest stimulation intensity that the patient can observe', THR served the same function in the same way to achieve the same result, and was insubstantially different." (D.I. 451 at 15 (internal citations omitted).) However, AB did not present any evidence to support that theory. At most, Dr. Popelka testified that there's no meaningful difference between setting the THR level just above or just below the 50% perceptibility threshold that an audiologist would consider to determine audibility.

AB's argument conflates the concepts of "audible," as an audiologist understands it, with the concept of minimum level that a patient can observe, which the claim language requires. An audiologist might set a T-level just above, or just below, the threshold to be audible, but a patient can observe some sound at either level. And neither Dr. Popelka nor any other witness testified that setting THR above or below the level that audiologists define as "audible" has anything to do with the ***lowest*** stimulation that a patient can observe, which is the test that matters. At times, a question posed to Dr. Popelka asked about the lowest stimulation level a patient can observe. But those questions weren't evidence, and Dr. Popelka couched his answers to the questions in terms of whether a

signal was "audible." (*E.g.*, D.I. 438 at 229:8-15.) That's not enough for AB to satisfy its burden of proof as to the doctrine of equivalents.[6]

### ii.    Contributory infringement

"To establish contributory infringement liability, the patent owner must show, among other things, that there are no substantial non-infringing uses." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (citing 35 U.S.C. § 271(c)). AB did not meet its burden to establish that there are no substantial non-infringing uses of MED-EL's MAESTRO software and fitting instructions. Rather than acknowledge and address this evidentiary gap, AB argues that MED-EL did not establish that MAESTRO has substantial non-infringing uses. But that's not MED-EL's burden. *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006). On the contrary, I instructed the jury that to establish contributory infringement, AB must prove that it is more likely than not that "the component or apparatus is not a staple article or commodity of commerce capable of substantial non-infringing use." (D.I. 440 at 661:19-21.) This charge mirrors the language that the Parties submitted to me as part of their joint proposed jury instructions, and AB did not object to this instruction during the charge conference. In short, AB has not addressed MED-EL's argument that it failed to present evidence as to an essential element

---

[6]    None of that changes if MED-EL recommends a THR level of 8% instead of 10% of the MCL because either way, the minimum level that a patient can observe could be even lower, and no one testified that a setting at either level served the same purpose in the same way as the claim element.

of contributory infringement, all but conceding that MED-EL is entitled to JMOL on this claim.

          **c.**       **Willfulness[7]**

To establish willfulness, a patentee must prove that the infringer committed "deliberate or intentional infringement." *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (quotation omitted).[8] Though the standards for induced infringement and willfulness are not the same (*see id.* at 1329), the evidence that establishes AB's induced infringement claim also supports the jury's finding that MED-EL's infringement of the '308 Patent was willful. For example, AB presented evidence that MED-EL did not make a good faith effort to avoid infringing the '308 Patent. Though MED-EL knew about the patent since August 2007—and described it as an improved method for determining stimulation currents during the fitting process—no one from MED-EL made Darla Franz aware of its existence prior to this lawsuit, even though she oversees educational materials and training regarding fitting MED-EL's products. In addition, MED-EL fails to

---

[7]     In its opposition, AB purports to incorporate by reference portions of its own post-trial motion in which it sets forth evidence supporting the jury's willfulness finding. (*See* D.I. 451 at 21.) However, I did not consider that briefing as part of my resolution of this issue because AB's attempt to incorporate six pages of additional briefing by reference is an impermissible end-run around my Policies and Procedures, which require that responsive briefs contain no more than 8,750 words.

[8]     The conduct necessary to warrant enhanced damages—*i.e.*, wanton, malicious, or bad-faith behavior—is not necessary to support willfulness finding. *See SRI Int'l*, 14 F.4th at 1330.

acknowledge that the jury could consider the fact that MED-EL continued to sell its relevant products after AB counterclaimed for infringement in this case.

MED-EL's reduction of the Lock THR function to 8% of the MCL value also demonstrates MED-EL's lack of good faith to avoid infringement. If MED-EL had a good faith desire to avoid infringing the '308 Patent, it could have disabled the Lock THR feature altogether or stopped advising audiologists to set the THR values globally at a defined percentage of the MCL. Simply put, AB presented evidence that MED-EL did the bare minimum in a half-hearted attempt to avoid some infringement of the '308 Patent. The jury was free to determine that MED-EL's infringement of the patent was deliberate and intentional. And MED-EL has failed to demonstrate that the great weight of evidence tilts in its favor, so it is not entitled to a new trial on this issue, either.

### 2.    The '647 Patent

The jury had a basis to determine that MED-EL's infringement of the '647 Patent was willful. MED-EL argues otherwise because "MED-EL began developing the RONDO sound processor … more than a year before MED-EL knew of the '647 Patent." (D.I. 442 at 23.) MED-EL suggests that its evidence of carrying on with business as usual negates an inference of deliberate infringement. But neither case it cites in support of this argument stands for such a broad proposition. In addition, one of those cases applied the higher standard for awarding enhanced damages, *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 2190055, at *2 (E.D. Tex. May 18, 2017), and the Federal

Circuit has since confirmed that such heightened requirement is not necessary to establish willful infringement. *See SRI Int'l*, 14 F.4th at 1330. I instructed the jury that in determining whether MED-EL's infringement of the '647 Patent was willful, it could consider whether MED-EL reasonably believed it did not infringe. The jury could reasonably conclude that MED-EL did not hold a reasonable belief as to infringement because MED-EL failed to mount any non-infringement defense at trial. I will not set aside the jury's verdict or award a new trial.

### B.    Damages

#### 1.    JMOL/new trial

When MED-EL first made its motion for JMOL following AB's case-in-chief, it asserted a generalized version of the more specific arguments it makes in this renewed motion. When I denied MED-EL's motion at the time, it seemed that MED-EL's issues with Ms. Davis's damages opinion concerned the weight of her testimony. However, with the benefit of full briefing on the issues and more time to consider the arguments, I have concluded that MED-EL's arguments challenge the sufficiency of Ms. Davis's testimony, and therefore their admissibility, rather than their weight.

To the extent MED-EL has concerns about the admissibility of Ms. Davis's methodology, it should have raised them in a *Daubert* motion by the deadline in my scheduling order. Because MED-EL did not challenge these aspects of Ms. Davis's damages opinion at that time, it has waived the ability to do so now.

I disagree with MED-EL's attempt to recharacterize its arguments as challenges to the sufficiency of the evidence before the jury. When MED-EL did not challenge the admission of Ms. Davis's testimony on this ground, it conceded the admissibility of that evidence. That is, it permitted the jury to consider it as evidence of damages. And the jury was free to credit it. MED-EL's arguments about why the jury should have rejected her analysis are just repackaged *Daubert* arguments. For example, MED-EL's arguments that Ms. Davis did not have an evidentiary basis to use audiologists' time savings as the measure for a reasonable royalty, did not have an evidentiary basis regarding how many hours they work per year, and failed to apportion the royalty base each attack the reliability of Ms. Davis's methodology, including the sufficiency of the basis on which she reached her opinions. If MED-EL wanted to prevent Ms. Davis from testifying for these reasons, then it had to file a *Daubert* motion. It didn't, and it must live with the consequences of its choice. Given Ms. Davis's testimony at trial, there was sufficient evidence for the jury to reach a decision as to AB's damages for the '308 Patent, so I will not disturb the verdict or order a new trial on this issue.

### 2. Enhanced damages

I have the discretion to increase AB's damages up to three times the amount the jury awarded. *See* 35 U.S.C. § 284. But "[e]nhanced damages are generally only appropriate in **egregious** cases of misconduct, such as willful, wanton, or malicious behavior." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017)

26

(citation omitted) (emphasis added). Such an award "does not necessarily flow from a willfulness finding." *SRI Int'l*, 14 F.4th at 1330 (quotation omitted). Instead, to determine whether the facts warrant enhanced damages, I must "consider the overall circumstances of the case." *Presidio*, 875 F.3d at 1382 (citation omitted). Although not required, I may consider the following non-exhaustive factors as part of my analysis: (a) whether MED-EL deliberately copied AB's ideas or design; (b) whether MED-EL investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (c) MED-EL's behavior as a party to the litigation; (d) MED-EL's size and financial condition; (e) the closeness of the case; (f) the duration of MED-EL's misconduct; (g) any remedial action by MED-EL; (h) MED-EL's motivation for harm; and (i) whether MED-EL attempted to conceal its misconduct. *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022) (citation omitted). The overall circumstances of this case do not warrant enhanced damages.

*First* and foremost, this **was** a close case, at least as to the '308 Patent. I have determined that AB did not present sufficient evidence to sustain its claims of contributory infringement and induced infringement through the DOE. While AB presented sufficient evidence of willfulness, the evidence was not overwhelming. AB's evidence that "MED-EL started infringing AB's patents shortly after they issued; continued infringing for sixteen ('308 patent) and seven ('647 patent) years; ... took no remedial action regarding its infringement; and was unable to mount robust non-infringement and invalidity defenses

for both patents" established MED-EL's deliberate and intentional infringement, (D.I. 444 at 9), it does not amount to **egregious** misconduct.

Despite its contentions to the contrary, AB did not present evidence that MED-EL "did no investigation to examine whether it was infringing AB's patents during all that time." (*Id.*) At most, AB presented evidence that MED-EL did not make Ms. Franz aware of the '308 Patent until this litigation began, and Ms. Franz never undertook an infringement analysis on her own because that is not part of her job. There is nothing willful or wanton about that. MED-EL's witnesses' lack of preparedness at their respective depositions might have been a basis for discovery sanctions or some other relief in the litigation, but it is not evidence that MED-EL never examined whether it was infringing AB's patents. The witnesses testified that they did not investigate when MED-EL first learned of AB's patents, and AB's counsel did not elicit any testimony from them about MED-EL's efforts (if any) to determine whether it was infringing. At most, Messrs. Oberhauser's and Kerber's deposition testimony suggests that MED-EL might have dragged its feet during discovery—an unfortunate (but not uncommon) practice. Indeed, MED-EL eventually stipulated to the dates it became aware of each patent.

*Second*, the evidence did not support a finding that MED-EL copied AB's products. As for the '308 Patent, the evidence at trial demonstrated that MED-EL had been instructing audiologists to set the THR values to a percentage of the MCL since 1997—years before the AB applied for the '308 Patent. In addition, MED-EL introduced evidence

that it had been working on the Lock THR feature for MAESTRO since February 2006—before it learned of the '308 Patent. As for the '647 Patent, AB does not point to any evidence in its brief that supports a finding that MED-EL copied the '647 Patent or an embodying AB product. On the contrary, evidence at trial demonstrated that MED-EL was developing the RONDO the year before it learned about AB's patent. Finally, I need not presume that the jury determined that MED-EL copied AB's patents or products because I instructed the jury that evidence of copying was just one of several factors the jury could consider when deciding the issue of willfulness.

*Third*, MED-EL's behavior during this case was not egregious or malicious. All the conduct about which AB complains occurred after I ruled on the Parties' cross-motions for summary judgment, when it became clear that AB's infringement counterclaims would be the only claims to proceed to trial. That MED-EL may have devoted renewed energy on those claims following that ruling does not amount to egregious misconduct.

It is true that MED-EL attempted to introduce previously undisclosed defenses and testimony right before trial, but doing so did not create so much additional work that it warrants enhanced damages. Other than AB's motion to strike, there were only five motions *in limine* for me to resolve, and all six motions were straightforward and easy to resolve on the papers. While MED-EL sought reconsideration of one of my rulings, AB did not need to expend further resources responding, given my individual Policies and Procedures. While AB complains that MED-EL's belated theories created unnecessary work

and distraction during the final weeks leading up to trial, that complaint is not compelling. I set the trial date on March 13, 2023, so AB had nearly nine months to prepare for trial on just two patents. Thus, the bulk of the preparation should have been done by the time MED-EL raised these issues.

In any event, I ruled on all the motions *in limine* more than a month before trial, so AB had ample time to adjust its trial plans in light of my rulings (which trimmed down the proceedings). Finally, that MED-EL refused to concede infringement as to the '647 Patent and pursued what AB calls a weak invalidity defense—requiring AB to prepare and use trial time to "put on its proofs"—does not amount to misconduct. (D.I. 444 at 11.) Litigation strategy is a key part of the adversarial system, and AB cannot be heard to complain that it was forced to prove the infringement claims it asserted. In short, nothing about MED-EL's litigation conduct is anything more than "garden-variety hard-fought patent infringement action between two competitors." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-05235, 2017 WL 130236, at *6 (N.D. Cal. Jan. 13, 2017).

*Fourth*, the remaining factors do not warrant enhanced damages either. While MED-EL may have greater motivation to harm AB because AB is one of MED-EL's two competitors in a small market, that fact alone doesn't warrant enhanced damages. And AB did not present any evidence regarding MED-EL's actual financial condition. As such, I will deny AB's request for enhanced damages.

### 3.    Attorneys' fees

This is not an exceptional case warranting the imposition of attorneys' fees under 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Using their discretion, courts make this determination on a case-by-case basis, "considering the totality of the circumstances." *Id.* A court may look to a variety of factors including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at n.6. A prevailing party seeking to recover its attorneys' fees under Section 285 must demonstrate that fees are warranted by a preponderance of the evidence. *See id.* at 557.

AB has not satisfied its burden under Section 285. This case just doesn't stand out from other patent infringement cases. Though MED-EL might have dragged its feet in revealing when it first learned of AB's patents, it did not go so far as to engage in "duplicitous discovery conduct" (D.I. 444 at 16), and its last-minute attempts to bolster its defensive claims following my rulings on summary judgment reflected the new reality of case rather than any bad faith on MED-EL's part. Finally, if "lack of respect" for a patentee's intellectual property were sufficient a reason to impose fees (*id.*), then attorneys' fees

31

would be warranted in every case where there is willful infringement, but that's not what Section 285 says. I will therefore deny AB's motion for attorneys' fees.

### 4.   Supplemental damages

MED-EL does not oppose AB's request for supplemental damages through the date of the judgment. I will therefore exercise my discretion and grant AB an award of supplemental damages through January 24, 2024. Because supplemental damages tend to be "based on the jury's damages verdict[,]" AB is entitled to damages based on the $28.58 royalty rate that the jury used in rendering its verdict. *E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, No. 14-cv-1250, 2017 WL 4004419, at *7 (D. Del. Sept. 12, 2017), *aff'd*, 921 F.3d 1060 (Fed. Cir. 2019). I will order MED-EL to produce an accounting of its additional infringing sales from September 1, 2023, until January 24, 2024, so that AB can make the necessary calculations.

### 5.   Ongoing royalty for the '308 Patent

"Although an ongoing royalty is not automatic, 'the Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement.'" *Purewick Corp. v. Sage Prod., LLC*, 666 F. Supp. 3d 419, 448 (D. Del. 2023), *appeal dismissed*, No. 2023-1868, 2023 WL 4230367 (Fed. Cir. June 28, 2023), *and appeal dismissed*, No. 2024-1184, 2024 WL 889332 (Fed. Cir. Mar. 1, 2024). MED-EL does not contest the imposition of an ongoing royalty due to its infringement of the '308 Patent. Thus, I will award AB an ongoing royalty.

In general, "the jury's damages award is a starting point for evaluating ongoing royalties." *Id.* at 449 (quotation omitted). In addition, I must consider: "(i) the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability'; (ii) 'changed economic circumstances, such as changes related to the market for the patented products'; and (iii) any other 'post-verdict factor' that would impact 'what a hypothetical negotiation would look like after the prior infringement verdict.'" *Id.* at 449 (quoting *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018)). AB bears the burden of showing "that it is entitled to a royalty rate in excess of the rate initially determined by the jury." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 3034655, at *7 (E.D. Tex. July 18, 2017) (Bryson, J.) (citation omitted). AB has met that burden.

The Federal Circuit has "held that there is a 'fundamental difference' between 'a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.'" *XY*, 890 F.3d at 1297 (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008)). Though the Federal Circuit has not retreated from that view, some of my colleagues have questioned the Court of Appeals' rationale "given that the jury is required to award a rate negotiated by willing licensors and licensees who considered the patent(s) to be valid and infringed." *Purewick*, 666 F. Supp.3d at 450 n.23; *see also Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.*, No. 20-cv-472, 2023 WL 1093654, at *3 n.7 (M.D.N.C. Jan. 27, 2023). While that may be true, I am also bound to follow the Federal

Circuit's holdings on this issue because it is a matter of patent law. And the Federal Circuit has determined that where, as here, "patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY*, 890 F.3d at 1297 (quotation omitted). Thus, I start with the presumption that AB would have been in a better bargaining position as of January 2024.

Aside from considering a change in bargaining position, I also consider "any changed circumstances ... between a hypothetical negotiation that occurred in [2007] (which the jury determined) and a hypothetical negotiation that would occur [now] after the judgment." *EMC Corp. v. Zerto, Inc.*, No. 12-cv-956, 2017 WL 3434212, at *4 (D. Del. Aug. 10, 2017). Because the jury's damages award was based on a reasonable royalty that stemmed from audiologists' salaries, I will consider the change to those salaries in fixing an ongoing royalty following the judgment. The jury adopted MED-EL's damages expert, Mr. Sussman's, calculations regarding a reasonable royalty, and his calculation was based on audiologists' median annual salary in 2007. In addition, Mr. Sussman opined that to the extent the parties to the hypothetical negotiation would have determined a royalty rate by considering audiologists' salaries, they would not have accounted for an increase in those salaries over time.

The jury adopted Mr. Sussman's calculation, and I will follow its lead and look at the median annual salary at the time of the post-verdict hypothetical negotiation, without regard for whether that salary might increase over time. *See Erfindergemeinschaft*, 2017

34

WL 3034655 at *7  If the parties engaged in a hypothetical negotiation in 2024, the most recent data available establishes that audiologists' median annual salary would be $82,680, which amounts to an estimated hourly rate of $39.75. (D.I. 445 at Appendix A, Schedule 3.) Thus, AB is entitled to an ongoing royalty of $39.75 from the date of the judgment until the '308 Patent expires.

### 6.   Interest

#### a.   Prejudgment interest

In patent infringement cases, "prejudgment interest [is] the rule, not the exception." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001). The statute mandates that upon a finding for the patentee, "the court **shall** award … interest and costs as fixed by the court." 35 U.S.C. § 284 (emphasis added). Despite this clear language and the fact that "[o]nly the written word is the law[,]" *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020), the Supreme Court has explained that "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). In this instance, however, MED-EL has failed to convince me that I should decline to award pre-judgment interest to AB because of dilatory conduct.

*First*, MED-EL has not shown that it suffered prejudice as result of AB's alleged undue delay in asserting its infringement claims. "[T]o show that delay was undue, a

defendant must, at least generally, show that it was prejudiced." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1375 (Fed. Cir. 2022). At most, MED-EL contends that AB's supposed delay in asserting its patents "greatly expanded the length of time over which prejudgment interest may be calculated." (D.I. 452 at 23.) But if increased interest were sufficient to demonstrate prejudice, then there would be a finding of prejudice in every case where there is any delay. Instead, it is more likely that the Federal Circuit requires some sort of prejudice other than the increased interest that follows every delay.

*Second*, even if MED-EL's claim of prejudice were sufficient—which it isn't—MED-EL has not offered any evidence supporting its claim of undue delay. MED-EL argues that AB's assertion of its patents must have been a litigation tactic because "AB asserted the '308 and '647 Patents against MED-EL as counterclaims over a decade after the '308 Patent issued and over six years after the '647 patent issued." (D.I. 452 at 23.) But the fact that many years passed between the issuance of the patents and AB's assertion of them does not tell me anything. The critical part of the inquiry is understanding when AB knew, or should have known, of MED-EL's infringement. MED-EL doesn't tell me that, and absent that information, there is no way for me to determine whether AB's delay in asserting the patents was undue.

*Third*, and finally, MED-EL's argument that an award of prejudgment interest would overcompensate AB is simply a rehashing of MED-EL's arguments about the strength of AB's damages case. Those arguments fail for the reasons I've already explained.

Trial courts are afforded "wide latitude in the selection of interest rates." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). "In this District, applying '[t]he prime rate is by far the most common practice ....'" *Galderma Lab'ys, L.P. v. Medinter US LLC*, No. 18-cv-1892, 2024 WL 456790, at *1 (D. Del. Feb. 5, 2024) (quoting *ArcherDX, LLC v. Qiagen Scis., LLC*, No. 18-cv-1019, 2022 WL 4597877, at *18 (D. Del. Sept. 30, 2022), *appeal dismissed*, No. 2023-2350, 2024 WL 1298348 (Fed. Cir. Mar. 27, 2024)). MED-EL's complaint that "AB provided no evidence that [it] borrowed money at a higher rate [or] what the rate was" does not convince me to depart from this District's standard practice. (D.I. 452 at 24.) AB need not "demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal*, 939 F.2d at 1545 (citation omitted).

"In addition, judges within this District have compounded prejudgment interest on a quarterly basis." *Galderma*, 2024 WL 456790 at *1. While MED-EL contends that interest should be compounded on an annual basis, it offers no argument or legal support to explain why that should be the case. Thus, I decline to adopt MED-EL's approach. Instead, I will award AB prejudgment interest at the prime rate, compounded quarterly. Once AB has the updated sales figures from MED-EL, it may move to amend the judgment to reflect the full amount owed, along with the prejudgment interest calculation.

### b.  Post-judgment interest

MED-EL does not dispute that AB is entitled to post-judgment interest, but it contends that AB is not entitled to post-judgment interest on enhanced damages. However, because I have determined that AB is not entitled to enhanced damages, MED-EL's argument is moot.

Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield ... for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). In addition, post-judgment interest must be computed daily and compounded annually. *See* 28 U.S.C. § 1961(b). "[P]ostjudgment interest should be calculated based upon the underlying judgment and award of prejudgment interest[,]" and "the award of post-judgment interest on the amended judgment (which includes pre-judgment interest) will not begin to run until the amended judgment is entered." *Galderma*, 2024 WL 456790 at *1 (quotation and citation omitted).

## IV.  CONCLUSION

MED-EL has not satisfied its heavy burden to establish that it is entitled to judgment as a matter of law or a new trial as to AB's claims. For its part, AB has not demonstrated that enhanced damages or attorneys' fees are warranted. But I will award AB supplemental damages, an ongoing royalty, and both pre- and post-judgment interest as requested. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

October 2, 2024